Johnston, Ch.,
delivered the opinion of the Court.
Of the numerous questions presented by this appeal, the only one argued was that respecting the relative liabilities of real and personal estate to the payment of the debts of a deceased.
Before proceeding to the more particular discussion of it, it may be proper to bestow a passing attention upon the direction of the testator, that the executor, “ out of his estate, pay off all his just debts and funeral expenses.” In the absence of any specific indication of the fund out of which the payment should be made, this direction is some evidence of intention that the executor should employ the personalty, which is at his disposal, as the means of accomplishing the end pointed out.
“If,” says a respectable elementary writer* “ the executor is pointed out as the person to pay, that excludes the presumption *85 that other persons, not named, are required to payand “ if the testator directs a particular person to pay, he is presumed, in the absence of all other circumstances, to intend him to pay out of the funds with which he is intrusted, and not out of other funds, over which he has no control.”
The distinction, though nice, is — as this author justly observes — clear in theory, however difficult in its application to particular cases.
But, without the aid of this clause, the majority of the Court is prepared to sustain the proposition submitted in argument by the plaintiffs’s counsel; that, in the administration of the assets of a testator, who has given no specific direction on the subject — as between legatees of the real and personal estate — the personal estate is liable for the payment of debts, before resort to the realty.
It is hardly necessary to remark that creditors are not concerned in the question. The Chancellor has properly observed that “ every portion of a testator’s estate is liable to creditors,” and, therefore, “ in regard to them, the question as to which fund is primarily liable, does not arise. They have the same facilities of relief, in the way of process, for enforcing payment against the one as against the other.”
It is stated in the decree — and it is true, beyond controversy— that, by the law of England, (which is our law, except so far as we have modified it,) personal estate is the primary fund, as between personal and real estate, standing in the same circumstances.
Has this law ever been abrogated or modified in this State ? Until the present time, I believe it has been received and accepted as the unquestioned law of the land, both by the community, the profession, and the Legislature ; and, if there has been no express adjudication on the point now presented, it may be accounted for by the fact, that the doctrine was never doubted; and, therefore, the question was never raised.
It is not perceived that the legislation of this State has abolished the distinction between real and personal property, in respect to their administration.
*86 It is true the statute de donis has not been adopted by us. Fees conditional, unless alienated by the tenant, or charged by him in his life time, as it is said he may-do,* descend, upon his death, per formam doni; and though, by the Statute 5 Geo. 2, ch. 7,† (of which I shall speak hereafter,) they may be as liable, in the hands of the special heirs, as lands held in fee simple are liable in the hands of the heirs general (which may be doubted) ; this does not prove that they are equally liable with personal estate.
It is also true that we have altered the law of descent as to real estate. The inheritance is no longer confined by primogeniture, but falls equally upon all the children. Does it follow that the intention was to strip the children of their inheritance,— to abolish the distinction between this species of property, — • which is in its nature inheritable, and goes to the heirs, and the chattel property, which goes to the personal representative, and in which the issue of the deceased have only an interest resulting to them, after the representative -has performed his duties out of it ?
The Statute 5 Geo. 2, ch. 7, § 4,‡ is no proof (further than that it has not been repealed by us,) of the policy of this State. It was enacted by a foreign legislature in 1732, while we were yet a colony. It has express and exclusive reference to the interests of creditors, and was probably intended to give confidence and security to the English merchants with whom the colonists dealt. There is nothing in it to affect the relative liability of lands and personal property, as between the heirs and distribu-tees, or the devisees and legatees ; and, as we have before observed, the question as between them is one in which creditors have no concern.
The decisions upon this statute, to which the decree refers, (which, by the way, have been greatly modified,)ǁ recognize the distinction between the liability of lands and chattels. How then can they be authority for the position that there is no distinction?
*87 The earliest of these decisions adjudged (though with a strength that has been diminished by subsequent cases,)* that an execution obtained by a creditor against the personal representative of his deceased debtor, might be levied upon his lands, in the hands of his heir, or devisee, though the heir or devisee was no party to, nor had notice of, the suit in which the execution was obtained, and though there were personal assets in the hands of the representative to satisfy the debt.
It is, perhaps, unfortunate that the cases alluded to, occurred in, — and that the questions involved in them, were consequently presented to, — a law Court. Had the creditor brought his case in equity, where perfect relief could have been administered with reference to the rights of all parties concerned, he might have brought in not only the heir, but the executor, and the decision would have been such as not only to secure the creditor in all his just rights, but to adjust the liabilities of the heir and executor according to the relation subsisting between them, and arising from the assets received by them, respectively.
The earlier law decisions to which I have alluded, did not, it seems to me, sufficiently distinguish, between the liability of the laud, created by the statute, and the remedy; or means of enforcing that liability. Too much stress was laid on the mere words of the statute, as respected the remedy.
No doubt exists that lands are made liable under the statute, but the material question in this case, was in no respect within its provision; and that question is affected by the decisions referred to in the decree, only so far as they affirmed the right of the creditor to sell the land in the hands of the heir, or devi-see, under a proceeding against the administrator or executor alone.
These decisions have never been satisfactory to the profession.† To sell a man’s land for debt, without impleading him, when the land was not bound by a judgment when it came to his possession, and when assets are, or may be, in the hands of an agent expressly appointed by law to pay the debt, is against *88 common right. The Courts have, on several occasions, expressed their regret that the decisions were ever made, and declared théir determination never to extend them, and have, in fact, materially restricted them. The decree, in this case, violates deliberate opinions thus expressed, by assuming that the decisions, are unexceptionable, declarative of the true policy of the State, and entitled to be extended to new results, beyond the points decided.
These decisions do not determine that the land — though liable — is not the secondary fund. The Judges were of a different opinion. It was not decided in these cases, nor could it be decided in a law forum, at least in such a proceeding, that the heir or devisee had no recourse over against the executor, or against the legatee, to whom the executor had paid the personal assets. The only judgment given was, that the land was liable to the unpaid creditor. Upon the Chancellor’s own principle, the heir was entitled to an after proceeding for contribution. This is proof that there is a right to recover over. Is there any thing in the decisions referred to, to shew the extent of this right, to shew that it is limited to an equal contribution, and shall not go to the whole loss sustained by the heir ? If not, then those decisions have determined nothing on the questions we are now discussing.
Taking those cases (I still mean the earlier cases quoted in the decree) to have decided nothing more than that the land of a deceased was liable for his debts, (and this is all they did decide,) their only fault was, that the judgment was made to bear upon a party who was never impleaded. The error in this decree consists in extending those decisions, by inference, into adjudications that land is equally liable with personalty for debts — when that point was not, and could not have been, adjudged in the cases.
The decree is not only confessedly contrary to the law, as we borrowed it from England, but is, as we have just shewn, unsupported by the cases referred to, to sustain it.
What else is there to support it ?
*89 The argument is that it is demanded by our peculiar policy.
At an earlier period of my judicial life, I would have said roundly — as I have perhaps somewhere said — that questions of policy are exclusively for the legislature, and that the sole duty of the Courts is to declare, and not to reform, the law. Greater experience has chastened and modified many of my earlier opinions; and among others, to a slight extent, those bearing upon this subject.
While the legislative power extends to all questions of policy, and while to the legislature belongs the right to alter and reform the law, at their discretion, with no other limit than the constitution, the judicial power, as it had always been exercised by Courts of justice, was vested, by the constitution, in the judicial forums.
It is their province to declare the law. But the law has never been stationary. It is, and has ever been, actuated by certain great cardinal principles ; and it is, and ever has been, the function of Courts of justice to apply these principles to the affairs of men, brought under their cognizance, as they may be varied by their circumstances, or the circumstances of the community, or the age.
By this process it must necessarily occur, that in the application of the leading or elementary principles, some subsidiary or secondary rules or principles, become, in the progress of time, more developed or perfected, and others more restricted, according as they serve, more or less, to promote and administer the great ends of forensic justice. ■
Sometimes a new subject, fit to be brought under judicial cognizance, is discovered, which had hitherto escaped observation, although the law of the forum fully embraced it. And sometimes a remedy is brought to view, which had not been hitherto administered, but which the powers of the Court enabled it, upon principle, to administer, and bound it to administer. Sometimes the legislature introduces, by statute, a principle, or enacts a measure, as a measure of policy, leaving the principle or the measure, to be carried out to its legitimate results.
*90 What is a Court to do 1 It is its shame, if possessing light, it does not discern its duty; and, if possessing the power, it does not employ it to the purposes for which it was created. It is its glory, if calling into exercise the great principles at its command, it so employs them as to advance the remedies within its jurisdiction.
Such an exercise of power has been called legislation — bench-made law. It is unjustly so denominated. It does not originate policy, but perfects it. It does not generate reforms, but carries them out. It does not create principles, but develops them. It is bench-declared law, not inferior in authority, or in excellence, to any other. Its progress is gradual, and occasions no sudden revolutions, to the surprise, or ruin, of the interests of society. Being the offspring of acknowledged principles, it commends itself, by the power of those principles, to those to whom it is applied. And being tested, at each step of its development, by practical experience, it may be modified, restricted or amplified, as that experience dictates.
These functions may be performed by the bench ; and rightly, usefully, and, I add, constitutionally performed. But the work must be done gradually, and with a constant regard to precedents, and an anxious reference to first principles. Sudden changes, great changes, changes looking to reform, or dictated by policy alone, belong exclusively to the legislature. To the Court belongs the development of pre-existing principles.
Then, what principles have we on which to rest the great innovation proposed by the decree ?
If we look to the origin and history of administration, or to the apparatus by which it always has been, and now is, accomplished, or to the respective qualities of real and personal property, we shall be led to conclusions very different from those proposed for our adoption. If we look to precedents, and to the opinions of our own Courts, and the action of our own legislature, we shall perceive what surprise and revulsion of property interests, and what inconvenience in the administration of estates, the adoption of that proposition would occasion.
*91 Administration was originally confined to personal property, and the course and subjects of it have never been altered, except by statute. It was performed by the Ordinary, originally, at his discretion; then, according to a course prescribed; after-wards by deputies appointed by him. The duties of these administrators, except when named by a testator, were secured by bond, according to the value of the personalty.
To accomplish the purposes of administration, the personalty vests in the personal representative, as its legal owner. Why ? To give him that control necessary to the perf of it. Only an equitable interest falls to the ; tee, to be enforced after the payment of debt§
This is the quality of personalty. Is it, estate ? No. That descends to the heir, vest in the personal representative; nor hasS such property, except what may result from the will. If it is devised, unless devised to the executor, or power is given him to dispose of it, he has no power to interfere with it, and the devisee takes it without his assent.
This distinction, in the qualities of the two species of property, forms one reason of the relative liability for debts. The executor has the control of the one and not of the other.
Are there no other reasons why land should be more favored than chattels ?
May it not be for the interest of infant or female devisees, to have their portions in that species of property, which is more permanent in its character, less subject to be eloigned, or devastated, upon which the marital right of the husband of a female heir would not so fully attach, and which cannot be alienated without her express consent after attaining majority ?
May it not be for the benefit of estates, that the debts be paid primarily out of that species of property which is more perishable, and more subject to be eloigned or devastated ; and which, as we all know, and as the decree states, is more saleable, and is less liable to be sacrificed.
Is nothing due to sentiment ? Is the home of one’s ancestors, *92 the place of one’s nativity, with which all the recollections of childhood are associated, to be put on a footing with vulgar chattels ?
The decree, in putting real and personal property upon the same footing, disregards the distinctive qualities of the two species of property. Can any sagacity foresee the results ?
Aliens are incapable of taking real estate by inheritance, but may take personalty. Is it not desirable to reserve, to those taking under a will, that species of property to which allegiance is annexed ?
How will the proposed alteration affect' the widow’s right to take dower by election ?
Will it not augment the necessities for that election, and call for the choice at an earlier period in the administration, when it will be more difficult to make it ?
Then, the decree establishes a principle, as I have said, contrary to the constant current of professional opinion, to the practice of our Courts, and to the legislation of the State. As evidence that it is contrary to the opinion of the profession as represented by the Judges, (besides referring to what is said in this very case,* — which is almost almost a decision for (he case— and to what is said in Laurens vs. Magrath,† which is almost a decision of the question,) I have only to refer to Stuart vs. Carson,‡ decided in 1796, and to the long current of cases which have followed it, as Haleyburton vs. Kershaw, (3 Des. 115 ;) Dunlap vs. Dunlap, (4 Des. 329 ;) Hall vs. Hall, (2 McC. Ch. 269;) Warley vs. Warley, (Bail. Eq. 397 ;) North vs. Valk, (Dud. Eq. 212;) Gregory vs. Forester, (1 McC. Ch. 329;) Goodhue vs. Barnwell, (Rice Eq. 240;) Pell vs. Ball, (1 Sp. Eq. 523 ;) and Jenkins vs. Hanahan, (Chev. Eq. 135.)
' What is said in these cases, though it may not amount to decision, gives unmistakeable evidence of settled opinion; especially the elaborate and most, enlightened view taken of the subject in Warley vs. Warley, which has' never before, so far as I know, been disputed.
*93 The decree is also contrary to the practice of both Courts.
For some evidence of the practice of this Court, I refer- to the case of Swift vs. Miles, (2 Rich. Eq. 154.)
That of the Court of Law is more explicit. The Rule of that Court requiring executors and administrators, pleading plene administravit, to file with the plea a full and particular account of their administration, on oath, with an office copy of the inventory and appraisement of the goods and chattels, evidently recognizes the liability of personalty before realty.
The 22d Rule (of those adopted the 4th July, 1758) directs that this be done “ to the end it may appear to the Court that the personal assetts of the testator or intestate are really and in truth fully administered.” After a preamble, reciting that suits were frequently brought against executors and administrators, to subject real estate of testators or intestates to the suing creditor, and that upon plea that the personal estate was fully administered, to which (admitting the plea) replication was made, that testator, or intestate, died seized of lands, &c., which course of practise was “ injurious to those persons, who by devise, descent, or otherwise, are intererested in the lands of the original debtor; and by fraud or collusion real assets may be subjected and made liable to the payment of debts, before the personal assets are exhausted and fully administered, for prevention whereof,” &c.*
The 6th Rule (of those adopted in 1800) requires the same account, on oath, to accompany the plea of plene administravit, “ to the end that it may appear to the Court that the personal assets of the testator, or intestate, are really administered, to the extent pleaded.”†
The 6th Rule (adopted in 1814) is in identical words.‡
The 6th Rule (adopted in 1837) is in the same words — omitting the word “ personal ” before “ assets,”§ probably to make the Rule -more perfect, by meeting and providing for the case where the will charged lands primarily or equally with personalty, and directed the executor to sell.
*94 To what has been said, I add that the decree is contrary to the legislation of the State ; and if the policy which the decree advances is the policy of the State, the Legislature was never aware of it.
The Statute of 178.9, Sec. 20,* prescribing the oath of an executor or administrator, with the will ' annexed, requires him to execute the will “by paying first the debts, and then the legacies, contained in said will, as far as his (testator’s) .goods and chattels will thereunto extend, and the law charge me,” and to make a true inventory of the goods and chattels; and the bond required from an administrator, cum testamento annexo) is directed to be conditioned for the administration of the goods and chattels only — although by the Act of 1787, such administrator might sell lands directed by the will to be sold, without saying by whom, the proceeds probably being regarded as personalty.
By the 19th section of the same statute of 1789,† power was conferred on the Ordinary, which he has possessed ever since, to sell personalty of testators or intestates, for payment of debts, as well as for division, or to prevent loss of perishable articles— yet he had no power to sell real estate, for any purpose, until 1824, when he was empowered to sell lands for division only.‡
The Statute of 1842,§ authorizing ordinaries, in certain cases, to pay over to executors or administrators the proceeds of real estates, sold by them for‘division, provides that this be done, “if the personal estate of any (such) testator, or intestate, in the hands of the administrator or executor, or if the assets set apart by a (the) last will and testament, be insufficient to pay the debts of the deceased.”
We have seen that the doctrine of the decree is unsupported by authority; that it is not only contrary to the English authorities, but contrary to the judicial opinion of this State ; contrary to the practice of the Courts, from the earliest times to the .present : contrary to the legislation of the State; that it confounds the well defined and very distinct qualities of the two species of *95 property, and sacrifices interests of devisees and heirs in real estate, without reason or necessity; and that it lays the foundation for further results, the effect of which cannot be foreseen.
To this I might add that the doctrine is contrary to that of other States,* whose condition and laws are similar to our own, and whose policy must, therefore, be the same; but I hasten to a conclusion.
It is argued that when a testator disposes of real and personal property, in the same words, to different persons, his intention is defeated, if the personal legacy is taken for debt, in exoneration of the devise of the realty. This is only true, if we suppose him to have drawn his will in ° ignorance of the law. Like disappointments frequently occur where that is the case, and can scarcely be prevented. But if a testator knows that unless he expressly makes real and personal equally liable, the legacies must contribute before the devises; he must intend when he gives them in the same terms, that the former shall be liable before the latter, and is not disappointed when the law takes its course.
Suppose the legal operation of his will had been explained to this testator, and that he still adhered to and executed his will, (and this is the legal presumption), where is the ground for ^disappointment ? The disappointment would have existed only if the legal operation of his will had been disallowed.
After all that can be said, the general reasoning of the decree applies as well to cases of intestacy as to those of testacy : and if lands should be put on the same footing with personalty in the one case, it should in the other; and who is prepared for that ?
If not prepared to go so far, and yet prepared to apply the doctrine proposed to testate property-leaving intestate to be governed by a different rule, have we not anomalies enough in the law already, without adding this to the number?
We prefer to stand where we are, and it is
*96 Ordered, That so much of the decree as sustains the first exception of the defendant, Ann Hull, be reversed, and that said exception be overruled ; and that with this modification the decree be affirmed.
Dunkin, C., concurred.

Decree modified.

 2 Story Eq. 5 1247.

 Izard vs. Izard, Bail. Eq. 234, 5.

 2 Stat. 571, P. L. 250.

 2 Stat. 571.

 See the cases, 4 McC. 129; 2 Hill, 579; Spear’s Eq. 250; 2 Hill Ch. 260.

 See the cases, 4 McC. 129; 2 Hill, 579 Spear’s Eq. 250; 2 Hill Ch. 260.

 See note (||) and Spears Eq. 252; Rice Eq. 388.

 2 Strob. Eq. 193.

 1 Rich. Eq. 300.

 1 Des. 513.

 Miller’s Comp. 4 — 5.

 Miller’s Comp. 14.

 Miller’-s Comp. 22. § Miller’s Comp. 34.

 5 Stat. 109.

 5 Stat. 109.

 6 Stat. 248. § 11 Stat. 232.

 3 Johns. ch. 148; 1 Paige, 190; 3 Murph. 201; 1 S. & R. 453; 3 Gill & J. 157; 6 Mass. R. 151; 13 s. & R. 348.